THOMSON S.A., Plaintiff,

v.

QUIXOTE CORPORATION and Disc Manufacturing, Inc., Defendants.

C.A. No. 94–83–LON.

United States District Court,
D. Delaware.

June 24, 1997.

Charles S. Crompton, Jr., and William J. Marsden, Jr., of Potter, Anderson & Corroon, Wilmington, DE; Of Counsel: George E. Badenoch, Richard L. Mayer, John Flock, Robert F. Perry, and Alexas D. Skucas, of Kenyon & Kenyon, New York, NY, for Plaintiff.

Thomas C. Grimm, and Lisa B. Baeurle, of Morris, Nichols, Arsht, & Tunnell, Wilmington, DE; Of Counsel: James B. Blanchard, and Harold V. Johnson, of Brinks Hofer Gilson & Lione, Chicago, IL; Ivan S. Kavrukov, and Thomas G. Carulli, of Cooper & Dunham, New York, NY; Thomas L. Giannetti, Frances M. Lynch, and Michael Phillips, of Fish & Neave, New York, NY, for Quixote Corp. and Disk Mfg., Inc.

## OPINION

LONGOBARDI, Senior District Judge.

Thomson S.A. ("Thomson") brought this action against Quixote Corporation ("Quixote") and Disk Manufacturing, Incorporated ("DMI"), among others, charging that the Defendants' manufacture and sale of optical disc products, including digital audio compact discs, violated four of Thomson's patents.[1] The parties agreed to base the outcome of trial on three representative claims: claims 1 and 13 of U.S. Patent 4,868,808 (the "'808 Patent") and claim 1 of U.S. Patent 5,182,743 (the "'743 Patent").[2] On June 28, 1996, this Court resolved questions of claim interpreta-tion pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The jury trial on liability began on July 22, 1996.[3]

The trial involved three primary issues: infringement, invalidity for non-joinder of inventors, and invalidity based on anticipation by prior invention. On July 30, 1996, the jury found that all of the representative claims were literally infringed; that the reverse doctrine of equivalents did not relieve Defendants from liability for infringement; that the patents were not invalid based on a failure to name the true inventors; but that each of the representative claims were invalid due to anticipation by prior invention, in accordance with 35 U.S.C. § 102(g).

On August 13, 1996, Thomson moved under Fed.R.Civ.P. 50(b) for an order setting aside the jury's prior invention invalidity verdict and directing the entry of Judgment as a Matter of Law ("JMOL") that the patents-in-suit are each valid and infringed. In support of its motion, Thomson argues that the jury's verdict on the prior invention question was not supported by substantial evidence. In the alternative, Thomson moves under Fed. R.Civ.P. 59 for a new trial on the prior invention issue. Defendants have opposed Thomson's motions.

Thomson contends that Defendants failed to prove by clear and convincing evidence that the prior invention met each and every element of the representative patent claims. Thomson argues that Defendants diverted the jury's attention away from an inquiry into whether the prior invention contained each of the elements of the patent claims and toward an improper comparison of the development of the prior invention with Thomson's efforts to develop a commercial product.

Defendants counter that Thomson's directed verdict motion at trial failed to meet the particularity requirements of Fed.R.Civ.P. 50(b) and that Thomson failed to renew its

---

1. All other defendants settled prior to trial.

2. The other patents in suit were U.S. Patent 4,196,183 and U.S. Patent 4,175,725.

3. The case was bifurcated into liability and damages phases by order dated November 14, 1995.

motion after the close of all evidence. Defendants further contend that they presented "more than substantial evidence" to prove anticipation of every element of the representative claims of the '808 and '743 patents.

## I.

Initially, this Court will consider whether Plaintiff's motion for judgment as a matter of law is procedurally defective. Defendants contend that Plaintiff's motion should not be considered because the specific grounds for the motion were not raised in the motion for directed verdict and because the motion was not renewed at the close of all evidence. Thomson, on the other hand, argues that the grounds for the motion were raised in its oral motion and that the motion was made at the close of all the evidence.

In making its JMOL motion, Thomson specified the judgment sought and the law and the facts supporting such a judgment. Thomson stated that it "moves for a directed verdict on the defense of invalidity based on prior invention by MCA." (Tr. 1122). In support of its motion, Thomson argued that Wilkinson and Canino did not testify "that the disk supposedly played in either June '72 or December met all of the limitations of the Tinet patent claims. And that's their burden, like clear and convincing evidence." (Tr. 1122). Moreover, Thomson asserted that "Slaten's conclusions are totally conclusory," with no facts to support them. (Tr. 1122–23). These assertions are in line with Thomson's post-trial briefing. They satisfy the requirements of Fed.R.Civ.P. 50(a)(2).

The second procedural argument made by Defendants is that Thomson did not renew its JMOL motion at the close of all evidence. This argument is without merit. When the JMOL motion was made, all of the evidence on the prior invention issue had been admitted. This is sufficient to meet the requirements of Fed. R.Civ. P. 50(b).

## II.

The anticipation by prior invention issue involved the development of a videodisc by MCA Discovision, Inc. ("MCA") in 1972.[4]

Defendants presented evidence that MCA successfully demonstrated a videodisc in June and December of 1972. The evidence in support of the prior invention defense came from the live testimony of Richard Wilkinson and Larry Canino and from reading Gary Slaten's expert report into the record along with portions of his deposition. Defendants also introduced into evidence certain MCA documents reviewed by Slaten. Thomson presented no witnesses regarding the MCA prior invention defense.

Richard Wilkinson and Larry Canino worked at MCA in 1972. They were two of approximately two dozen employees who were working on the development of a videodisc at MCA in the early 1970's. Wilkinson joined MCA in May 1971. (Tr. 734). Wilkinson's primary responsibility at MCA during the relevant time period was to prepare "masters," which were large glass discs, about fourteen inches in diameter, on which a thin metal film was placed. A laser was used to melt many holes, or pits, (about seven million per second) in the metal film. Wilkinson explained that the holes in the metal film had variable lengths and that the spaces were also variable. (Tr. 747). The length of the pits and spaces were directly representative of information from a television signal. (Tr. 747). After this master disc was created, a layer of negative photoresist was coated on the master in order to create a bump wherever there was a hole in the master. (Tr. 753).

These masters were designed to make replicas, which were the actual videodiscs. (Tr. 759). The replica was required to have the exact same arrangement of bumps and spaces as the master, so as to accurately represent the signal that had been recorded onto the master. (Tr. 760). When Wilkinson joined MCA in 1971, they were not yet able to replicate the masters. (Tr. 760–61). It was not until shortly before the June 1972 demonstration that MCA could replicate discs in "the regular manner." (Tr. 769).

Wilkinson testified that the scientists in his group gave two demonstrations of videodisc technology to MCA executives on June 12,

4. The parties have stipulated that the priority date for the patents-in-suit is August 25, 1972.

1972. (Tr. 778–80). One demonstration played a master disc and the other played a replica. (Tr. 779). Another set of demonstrations, this time public, was planned for December of 1972. The level of work at MCA between the June demonstrations and the December demonstrations, according to Wilkinson, was "very intense." (Tr. 790). The December demonstrations were designed to be "a big show biz event." (Tr. 792). The December demonstrations were, in essence, the public debut of the MCA videodisc technology. Wilkinson testified that the discs demonstrated in June and those demonstrated in December had the exact same format. (Tr. 801).

Wilkinson described much of the MCA videodisc's format. The bumps were arranged in a spiral track that extended from an innermost radius of about three inches to an outermost radius of six inches, with a spacing between the tracks of two micrometers. (Tr. 756). The widths of the bumps on the master were one micron wide or less, depending upon their radial position on the disc. (Tr. 756). At the outer radius of the disc, the bumps would get wider than one micron, yet the pitch would remain two microns. (Tr. 848). The lengths always remained longer than the widths, regardless of where on the radius of the disc they were placed. (Tr. 757). Although the widths of the bumps generally remained the same size, with a slight variation depending upon the radius, the lengths of the bumps and spaces were continuously variable, thereby representing the information from the recorded signal. (Tr. 747, 801). Wilkinson also explained that the track pitch was two microns and the width of the track was about a micron.[5] (Tr. 757). The masters did not have a continuously reflective surface over the entire disc, but the replica discs did feature a reflective coating over the whole of the disc. (Tr. 837–38). The MCA disc retained these same dimensions and features until around 1976. (Tr. 759). Wilkinson explained that the format of the disc was "a given." (Tr. 858).

Wilkinson also described the tracking system for the disc, i.e. the way that the disc was designed to enable the light spot to remain focused on the spiral track. The laser light was kept on the track by measuring the light energy diffracting off of the disc. Although the disc at MCA was tracked by a light beam illuminating the side of the track, Wilkinson testified that the same disc could have been tracked down the center if a different player were used. (Tr. 808).

Lawrence Canino was the other live witness to testify regarding the MCA prior invention defense. Canino began work at MCA in June 1972 and continued there until 1978 or 1979. (Tr. 895–96, 903). Canino was primarily involved with the development of videodisc players at MCA. (Tr. 900, 907). He was able to describe in greater detail the tracking mechanism:

The home player, the light was focused on the disk slightly off center, and the light from that spot was more as you got closer to the center of the track, less if it would come back to the photodetector. And as you got further away from the spot to the land area, the area without spots, more light would be reflected.

So it's as if you are driving down the street and one side of the road to the left appears to be white and the right appears to be black, and all you can do is look through a whole in the floor and if it gets brighter you know you should go to the right. And if it gets darker, you know you should go to the left. And that's all that it was doing.

(Tr. 910). This side tracking system did not depend on any asymmetry of the diffraction; rather, the system measured the total amplitude of light only. (Tr. 964–65).

Canino witnessed one of the demonstrations that were held in June 1972. He explained that after the June demonstrations they worked "feverishly" between June and December of 1972 to improve the players. (Tr. 920). Canino was also present at a December demonstration, where he saw a thin replica disc played. Canino testified

5. The term "pitch" means the distance between the center line of one track to the center line of another track.

that in both the June and the December demonstrations, a thin replica disc was played. (Tr. 931–32).

Canino also testified regarding the format of the disc. He explained that the pitch was roughly two microns, with variable length bumps and spaces. (Tr. 929). Canino also stated that the light spot "would have to be roughly comparable in size to the pit or bump." (Tr. 962). In other words, "the spot would be as large as the bump is wide." (Tr. 962).

Defendants' expert witness on the MCA prior invention defense, Gary Slaten, did not attend trial. Instead, his expert report and deposition testimony were read into evidence, and his claim charts were also admitted. Slaten had worked at MCA from March 1973 until 1982. During that time, he established the picture quality department, managed the disc replication department, and designed and started up the disc manufacturing facility. (Tr. 1074–75). Slaten noted that the discs produced at MCA in 1973 and 1974 had the same configuration as a disc produced in 1972. He reported that the replica discs had bumps with widths of between .6 and .7 microns and were arranged in a continuous spiral track. Slaten stated in his report that the length of the bumps and spaces "varied with the frequency of the modulated carrier representing information." (Tr. 1078). The length of the bumps was greater than their widths. (Tr. 1078). The entire replica disc was coated with a reflective layer and was read with a laser focused to a spot size of approximately one micron. (Tr. 1078). Appendices to Slaten's expert report were admitted into evidence. In these appendices, his claim charts, Slaten opined that each element of each of the representative claims was present in the MCA disc.

### III.

■ The law applicable to this dispute is fairly straightforward. A patent is presumed valid. 35 U.S.C. § 283. The party asserting invalidity has the burden of proof. *Id.* This burden is satisfied only by proving facts establishing invalidity by clear and convincing evidence. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 872 (Fed.Cir.1985); *Mobil Oil*

*Corp. v. Amoco Chems. Corp.,* 779 F.Supp. 1429, 1488 (D.Del.1991), aff'd 980 F.2d 742 (Fed.Cir.1992). The " 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.' " *Buildex Inc. v. Kason Indus., Inc.,* 849 F.2d 1461, 1463 (Fed. Cir.1988).

The relevant invalidity contention for purposes of the pending motions is anticipation by prior invention, which is codified at 35 U.S.C. § 102. That statute provides in relevant part:

> A person shall be entitled to a patent unless—
>
> (g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

35 U.S.C. § 102(g).

This Court charged the jury on the law applicable to a determination of the anticipation issue. (Tr. 1378–1384). The Court provided to the jury a complete copy of those instructions. (Tr. 1388). The Court instructed the jury that every claim element must have been present in a prior invention in order for the patent to be invalid:

### 4.2 ANTICIPATION— ALL ELEMENTS

> In order to prove anticipation of the invention claimed in one of the representative claims under 35 U.S.C. § 102(g), it is necessary that all the elements of the invention, as expressed in that representative claim, be found in a single prior invention and that prior invention must not have been abandoned, suppressed or concealed.

The Federal Circuit has held that "[i]t is axiomatic that for prior art to anticipate under § 102 it has to meet every element of the claimed invention, and that such a determination is one of fact." *Hybritech Inc. v. Mono-*

*clonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed.Cir.1986).

Thomson has moved for judgment as a matter of law.[6] In resolving such a motion in a case tried to a jury, this Court must examine whether there is evidence in the record upon which the jury could have properly returned the verdict of invalidity by anticipation in Defendants' favor. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). This court must uphold all of the factual findings of the jury unless Plaintiff shows that there is not substantial evidence to support a finding in favor of Defendants. *Id.* The question presented is whether there is substantial evidence in the record upon which the jury could properly have found, by clear and convincing evidence, each element of the representative claims to be present in the MCA disc. In order to resolve that issue, an element-by-element examination of each representative claim is required.

### IV.

■ As previously stated, trial involved three representative claims: claims 1 and 13 of the '808 Patent and claim 1 of the '743 Patent. Thomson divides claims 1 and 13 of the '808 patent into twenty elements:

[1] An optical readable carrier comprising:

[2] a substrate on which

[3] data elements are stored

[4] as a succession of projections [depressions, not complete through holes,] with respect to

[5] a smooth reference surface,

[6] the succession of projections [depressions] forming tracks,

[7] each projection [depression] having substantially the same width,

[8] which width does not exceed 2 microns,

[9] a length equal to or greater than its width,

[10] and a closed contour in the reference surface,

[11] said closed contour being diffractive

[12] along its entire extent,

[13] wherein each of said projections [depressions] has a respective one of said data elements stored continuously along said entire length of said diffractive contour

[14] and diffraction occurs along the entire length of said data element

[15] continually indicative of the recorded information,

[16] successive data elements along a track being separated by clearance spaces,

[17] at least as long as the width of a data element, in the reference surface,

[18] with the information contained in said stored data elements being indicated by the continuous extent of each of said closed diffractive contours and by the extent of each of said clearance spaces,

[19] the tracks being separated from one another by clearance bands in the reference surface, the tracks having a pitch from one track to the next of at least two times the width of a data element; and

[20] a reflective coating on said reference surface and projections (depressions)

Thomson divides claim 1 of the '743 Patent into eight constituent elements:

[1] An optical readable carrier comprising:

[2] a substrate

[3] with diffractive tracks

[4] having respective longitudinal axes

[5] and including at least longitudinal contours substantially parallel to said respective axes, along which contours there is deviation from a reference surface of said substrate towards zones non-coplanar with said reference surface, each of said tracks having a width of at most 2 microns,

[6] said tracks being diffractive all along said longitudinal contours

---

**6.** Thomson has not claimed that there was no reduction to practice or a lack of diligence. Rather, Thomson rests its motion for JMOL on its contention that there is insufficient evidence in the record to support the jury's finding that each element of the representative claims was present in the MCA disc.

[7] for providing diffraction of light of a light spot illuminating one of said tracks and substantially occupying the width of said one track,

[8] said contours of said one track providing said diffraction being such that the light emerging from the diffractive track has a spatial distribution representing an amount of track misregistration between the spot and axis of said one track.

Thomson argues that there was insufficient evidence in the record for the jury to find that the MCA disc met claim elements 7, 12, 13, 14, 15, and 19 of the '808 Patent. As for the '743 Patent, Thomson contends that there exists no substantial evidence in the record by which the jury could have found that the MCA disc contained claim elements 5, 6, 7, and 8. Each will be analyzed in turn.

## A. '808 *PATENT*

### 1. *ELEMENT 7*

Claim element 7 requires each projection or depression to have substantially the same width. Thomson cites Wilkinson's testimony that the MCA bumps varied in width, along with their length. (Tr. 803). After a full review of Wilkinson's testimony, along with the other evidence, this Court finds that the jury could have reached the conclusion that the projections of the MCA disc had substantially the same width.

Wilkinson testified that "[t]he widths were on average about one micron, one micrometer wide or less, depending upon what radial position you were on on the disk." (Tr. 756). Slaten reported that the replica discs had bumps with widths of between .6 and .7 microns. One of Slaten's exhibits, DX–489, stated that the bump width was 1 micron or less. In DX–493, Slaten opined that "[t]he bumps on the MCA Discovision disc had substantially the same width."

Wilkinson did testify that "[t]here was some variation in the width of the bumps, depending upon the radius of the disk. At a small radius, it was less than, and at the outer end of the disk it might be the one micron." However, his testimony was clear that "[p]it to pit width was not varying." (Tr. 877). The slight variation in width

based on the radial position of the pits was one of "the kind of problems" that MCA tried to fix between the June and December demonstrations. (Tr. 853). Such variation was not part of the MCA invention. Indeed, the MCA invention, like the patented invention, depended on a substantially constant pit width. Wilkinson testified that in 1972 MCA achieved a constant pit width "for the majority of the surface of the disk." (Tr. 859).

In considering all of the competent evidence, the jury could reasonably have reached the conclusion that the widths of the projections along the track of the MCA disc were substantially the same size.

### 2. *ELEMENT 12*

Claim element 12 requires the closed contour to be diffractive along its entire extent. There is no evidence in the record that would suggest that the closed contour was not diffractive along its entire extent. Indeed, in its reply brief Thomson concedes that claim element 12 requires "that each pit be diffractive 'along its entire extent'" and that "[t]here is no dispute that small bumps or pits on the [MCA] disc are inherently diffractive...." (D.I. 313 at 8). Thomson makes the novel argument that the claim element requires the pit to be "deliberately diffractive" along its entire length. (D.I. 313 at 8). But that is not the language of the claim.

The evidence at trial showed clearly and convincingly that pits and projections are, by their very nature, diffractive along their entire extent. There is also evidence in the record, both from Wilkinson and Slaten, showing specifically that the MCA bumps were diffractive along their entire extent. (Tr. 802); (DX–493).

### 3. *ELEMENT 13*

Claim element 13 requires each of the projections or depressions in the disc, generally called "bumps" by the witnesses who testified about the MCA invention, to have "a respective one of said data elements stored continuously along said entire length of said diffractive contour." This Court instructed the jury that "[t]his means each pit must store a single data element or pulse of the bi-

level electrical signal." The evidence to support the jury's verdict is overwhelming. Defense Exhibit 487 directly demonstrated the relationship of the signal to the pit. That chart shows that one pulse of the signal was represented by one pit or projection; there was a correspondence of one pulse to one projection. Wilkinson explained that the holes in the master were "continuously variable" in length and that the variability of the lengths of the holes depended upon the frequency of the information that was being recorded. (Tr. 747). The spaces were also variable in length. When asked if the variation represented the recorded information, Wilkinson responded, "Yes, directly." (Tr. 747). Wilkinson likened the recording of the signal onto the disc to waves in a pond:

> If you think of waves in a pond, if you throw a rock in a puddle of water, you will see waves emanating from the center. The spacing between the waves, if the waves are very close together, we call that high frequency. If the waves are far apart, that's low frequency.
>
> Same thing on the disk. If the pits were close together that was high frequency. And if the pits were farther apart, that was low frequency.

(Tr. 748).

When explaining DX-487, Wilkinson noted that the "Modulated Signal" listed in DX-487 "are the waves, just as if they were waves in the water." That modulated signal, the wavy signal, is transferred into a "square" frequency modulated wave that tells the laser when to create a hole in the reference surface. In this way the holes and spaces in the master directly represent the information contained in the frequency modulated signal. The holes and spaces that represented the signal on the MCA master disc appeared on the replica discs as projections and spaces. (Tr. 750). In addition to this evidence, Slaten submitted a claim chart in which he asserted that "[t]he bumps on the MCA DiscoVision disc were diffractive along their entire extent continually indicative of recorded information." (DX-493).

In sum, the evidence was wholly sufficient for the jury to find, by clear and convincing

evidence, claim element 13 to be present in the MCA disc.

#### 4. *ELEMENT 14*

Claim element 14 requires diffraction to occur along the entire length of a data element. Little additional discussion is necessary to show that there was substantial evidence in the record to support the jury's finding that claim element 14 was present in the MCA disc.

This Court explained to the jury that "[t]he term 'data element' in the claim refers to a single pulse of the bi-level signal stored on the disc, whatever that signal is, digital or analog." (Tr. 1366). As previously discussed, each bump on the MCA disc contained one data element which represented one pulse of the signal. This Court has also determined that the evidence supported the jury's decision that diffraction occurs along the entire extent of the closed contour of the bump. It necessarily follows that diffraction occurs along the entire length of the data element.

Consequently, this Court finds substantial evidence in the record to support the jury's decision that the MCA disc satisfied claim element 14.

#### 5. *ELEMENT 15*

Under claim element 15 of the '808 Patent, the diffraction must be "continually indicative of the recorded information." Regarding the MCA disc, Thomson argues that the diffraction would not have been continually indicative of the recorded information; rather, it would be intermittently indicative of the recorded information. In other words, Thomson believes that the MCA disc was read by "bump counting." In its brief, Thomson explained its bump counting theory:

> Bumps or spaces or both can vary in length as a function of frequency, and the stored frequency can thereafter be read back by merely counting the number of bumps or spaces in a given length of track. This type of information storage and playback could easily have been used at MCA, and it would be fully consistent both with the appearance and description of the bumps in the exhibits and with the suc-

cessful demonstration of video playback described in Wilkinson's and Canino's testimony. (D.I. 308 at 25). Thomson suggested this bump counting theory in its closing argument: "What you end up doing is just counting the bumps." (Tr. 1314).

The jury rejected Thomson's theory, and there is substantial evidence in the record to support the jury's decision to do so. Wilkinson's testimony about DX–487 would be wholly inconsistent with Thomson's bump counting theory. As previously stated, DX–487 shows that one pulse of the signal was represented by one pit or projection, that there was a correspondence of one pulse to one projection. These bumps and spaces were variable in length, and that variability correlated to the frequency of the information that was being recorded. When Wilkinson was asked if the variation represented the recorded information, he responded, "Yes, directly." (Tr. 747).

Wilkinson's explanation of the technology, including his analogy to the "waves in a pond," is inconsistent with Thomson's bump counting theory. Under the bump counting theory, the length of the bumps and spaces is not critical. In closing argument, Thomson argued to the jury:

They're not telling you the shape of the bumps was longer or that the length varied or that's how they were storing information. They had little conical bumps they were counting.

(Tr. 1314). But Wilkinson testified that the signal was represented on the disc by the variation of the length of the bumps and spaces. The jury was entitled to rely on Wilkinson's explanation of the technology, rather than on Thomson's lawyer's arguments about the proper interpretation of the documentary evidence, such as SEM photos and subsequently filed MCA patents.

Furthermore, Slaten submitted a claim chart in which he asserted that "[t]he bumps on the MCA DiscoVision disc were diffractive along their entire extent continually indicative of recorded information." (DX–493). This opinion was consistent with Wilkinson's testimony and could have been considered by the jury in reaching their verdict. There was no countervailing opinion expressed by any other expert witness. It is hardly surprising that in the absence of an expert opinion to give legitimacy to Thomson's bump counting theory that the jury found the testimony from Wilkinson and the opinion of Slaten to be clear and convincing proof of invalidity.

### 6. ELEMENT 19

Claim element 19 in the '808 Patent requires "the tracks [to be] separated from one another by clearance bands in the reference surface, the tracks having a pitch from one track to the next of at least two times the width of a data element." There is no real dispute that the MCA disc had tracks that were separated from one another by clearance bands in the reference surface. The question is whether the dimensional limitations of this claim element were met; i.e., whether the track pitch was two times the width of a data element.

The term "pitch" means the distance between the center line of one track to the center line of another track. The tracks were separated by clearance bands so that the light spot would interact with only one track at a time. Without clearance bands, there would be cross-talk from tracks other than the one that the light spot was attempting to follow. The dimensional limitations regarding track pitch, in conjunction with the patent's limitation on light spot size, served to reduce the potential for cross-talk.

Wilkinson testified that "[t]he widths [of the MCA disc] were on average about one micron, one micrometer wide or less, depending upon what radial position you were on on the disk." (Tr. 756). Slaten reported that the replica discs had bumps with widths of between .6 and .7 microns. One of Slaten's exhibits, DX–489, stated that the bump width was 1 micron or less. Based on this testimony, the jury could have concluded that the track width was anywhere from .6 microns to 1 micron.

In order for claim element 19 to be satisfied, the track pitch would need to be at least two times the width of a data element. Because the data elements were from .6 to 1

micron wide, the track pitch would have to be at least 1.2 to 2 microns wide. The testimony and exhibits introduced into evidence support the jury's determination that the MCA disc met the dimensional limitations of claim element 19. Wilkinson testified that the disc format "came from doing arithmetic on the market requirements." (Tr. 815). He explained that the "arithmetic tells you that the track pitch must be two microns." (Tr. 758). Wilkinson's chart, DX–489, supports his testimony. It explains that the MCA Disc had a "[b]ump width [of] 1 micron or less" and had a "track pitch [of] 2 microns." (DX–489).

Other evidence supports the jury's verdict. Canino testified that the track pitch was "[t]wo microns roughly." similarly, a later-filed MCA patent describes the disc format as "approximately 1 micron in width" with a "track to track spacing of approximately 2 microns." (DX–90, col. 1, line 60—col. 2, line 4). From all of this evidence, it was perfectly reasonable for the jury to conclude that the tracks on the MCA disc had a pitch from one track to the next of at least two times the width of a data element.

To conclude, there was substantial evidence in the record to support the jury's finding, by clear and convincing evidence, that each claim element of the '808 Patent was present in the MCA disc.

### B. *'743 PATENT*

#### 1. *ELEMENT 5*

Under claim element 5, a disc must include "longitudinal contours substantially parallel to said respective axes, along which contours there is deviation from a reference surface of said substrate towards zones non-coplanar with said reference surface, each of said tracks having a width of at most 2 microns." Thomson believes that the MCA disc does not contain longitudinal contours substantially parallel to the track axes. (D.I. 308 at 26).

Thomson's expert, Leonard Laub, testified that longitudinal contours are represented on figure 2 of the '743 Patent by dashed lines that connect the edges of the successive features, which in the case of the MCA disc would be the bumps. In order to satisfy this claim element, the contours of the bumps would have to be both longitudinal and substantially parallel to the track axes. There is substantial evidence in the record to support the jury's decision that the contours were longitudinal. Wilkinson testified that the bumps "were always longer than their width." (Tr. 756). In his chart, Wilkinson explained that "[b]umps are longer than wide." (DX–489). The jury could have decided, based on this testimony, that the MCA disc featured longitudinal contours.

There was also testimony to support the jury's finding that these longitudinal contours were substantially parallel to the track axes. This Court explained to the jury that the longitudinal axis could be "any arbitrary reference that follows along the length of the track, such as the centerline of the track." This claim element therefore requires the longitudinal contours to be parallel to each other and to the centerline. To further explain, if one were to draw lines connecting the longitudinal contours, the resulting drawing should resemble train tracks. The "rails" of the tracks would need to be substantially parallel. Because the bumps are substantially the same width, the longitudinal contours would be parallel to the track axis. Furthermore, Slaten explained in his claim charts that "[t]he bumps on the MCA Disco-Vision disc were elongated and arranged with their longitudinal contours parallel to the direction of the track." Based on all of this evidence, and the reasonable inferences to be derived therefrom, the jury could have determined that the MCA disc had longitudinal contours substantially parallel to the track axes.

#### 2. *ELEMENT 6*

Under claim element 6, the tracks must be "diffractive all along said longitudinal contours." There can be little question that this claim element was present in the MCA disc. When asked about claim element 6 at trial, Plaintiff's expert, Leonard Laub, compared it to claim elements 11 and 12 of the '808 Patent:

This is slightly different wording, but the same story as a similar part of the '808 claims that we were looking at. That,

again, this goes back to the notion that wherever you fall on a pit the light is diffracted.

(Tr. 406).

In accordance with claim element 7, the patent required a "light spot illuminating one of said tracks and substantially occupying the width of said one track." The light spot had to be roughly equal to the width of the track. Assuming that claim element 7 was met, with a light spot of that size striking bumps that were between .6 to 1 micron wide, the entirety of the longitudinal contours would be illuminated. Wilkinson testified that the bumps had "a very powerful diffractive effect on the light." (Tr. 802). Slaten's claim chart also supports the jury's finding. That chart states that "[t]he bumps on the MCA Discovision disc were diffractive along their entire extent." (DX–494). In sum, the jury's decision on claim element 6 of the '743 Patent is supported by substantial evidence.

### 3. ELEMENT 7

Claim element 7 explains that the purpose of having tracks that are diffractive all along their longitudinal contours is "for providing diffraction of light of a light spot illuminating one of said tracks and substantially occupying the width of said one track." After the Markman hearing, this Court held that "the term 'substantially occupying the width of said one track' means that the light spot must be roughly equal to the width of the track." A more exact definition of light spot size was not mandated by the patent claims, specification, or prosecution history.

There was substantial evidence in the record to support a finding that the light spot size was roughly equal to the width of the track. Slaten stated that the MCA replica disc was read with a laser focused to a spot size of approximately one micron. (Tr. 1078). As previously noted, there was much testimony to the effect that the bumps were about 1 micron wide. The jury could have inferred from this testimony that the light spot was roughly equal in size to the width of the bumps.

Moreover, Canino testified that the light spot was the same size as the width of the bumps. During cross examination, Canino

corrected Thomson's counsel's drawing of a light spot, stressing that the spot size equalled the bump width:

> But the spot would be as large as the bump is wide. It's not like have you [sic] a little spot and it's off to the center. So if you're going to draw it, it should be as big around as the spot is wide.

(Tr. 962). It is undisputed that the MCA disc was designed to illuminate one track at a time.

Slaten's claim chart states that "[t]he bumps on the MCA DiscoVision disc provided diffraction of a light spot which had a diameter greater than the width of one track." This is consistent with Slaten's other testimony, that the bumps were around .6 or .7 microns in width and that the light spot size was approximately 1 micron in diameter. The jury reasonably could have found that a .6 or .7 micron bump is roughly equal to a 1 micron light spot. Alternatively, the jury could have determined that the bump was about 1 micron wide, which was the preponderant testimony, and that the light spot size was also about 1 micron.

Therefore, substantial evidence exists in the record to support the jury's finding that claim element 7 of the '743 Patent was present in the MCA disc.

### 4. ELEMENT 8

Under claim element 8, the longitudinal "contours of said one track providing said diffraction" must be such that "the light emerging from the diffractive track has a spatial distribution representing an amount of track misregistration between the spot and axis of said one track." The disagreement between the parties on this point is whether the asymmetrically shifting spacial distribution of the light coming off the track of the MCA disc represented an amount of track misregistration. Defendants contend that, although the tracking system used by MCA did not work by asymmetry of diffraction, the disc itself did have an asymmetry of diffraction that represented an amount of track misregistration. on the contrary, Thomson argues that the asymmetrically shifting spatial distribution of the light diffracted

from the MCA disc could not reliably indicate track misregistration.

Leonard Laub aptly described the concept of spatial distribution:

The blob of light could be called in these exalted terms a spatial distribution. Distribution means you spread something out. Spatial distribution means you spread it out over space.

So if I spill this water on the table, I have made a spatial distribution of water. If it's a nice round blob of water that's fine. If there's more water on one side than the other, then it's a spatial distribution which is not symmetrical. It's bigger on this side or that.

(Tr. 414).

Canino testified that the MCA disc had an asymmetry of diffraction, i.e., an asymmetrical spatial distribution of light, but that the MCA "system" did not use that spatial distribution to keep the light spot on track:

It's a true statement that the entire system did not work by asymmetry of diffraction. And, as I just explained, it worked by measuring amplitude or power of the signal only. The disc itself had asymmetry of diffraction, but the entire system did not work that way.

(Tr. 966). Canino explained that the MCA tracking system worked by measuring the amplitude or power of the signal. He explained that "the light was focused on the disk slightly off center, and the light from that spot was more as you got closer to the center of the track, less if it would come back to the photodetector.... [A]s you got further away from the spot to the land area, the area without spots, more light would be reflected." (Tr. 910).

It is clear from the record that MCA did not keep the light spot on track by measuring the spatial distribution of light emanating from the disc. But that is not the issue. The patents at issue relate to the structure of a disc, not to the player or overall "system." Under the '743 Patent, the spatial distribution of light coming off the track is required by the patent to represent an amount of track misregistration. If the spatial distribution of light coming off the track of the MCA

disc *represented* an amount of track misregistration, it would meet claim element 8 even though the player that MCA had developed did not utilize this information. The issue is whether the distribution of light could have been used by a properly constructed player to indicate when the light spot has gone "off-track."

There is at least some evidence in the record to support the jury's decision that this claim element was met in the present case. Slaten opined in his claim chart that "[t]he contours of the track on the MCA DiscoVision disc were such that the light emerging from the diffractive track represented an amount of track misregistration between the spot and the axis of the track." (DX–494). The jury reasonably could have given Slaten's opinion great weight. After all, Slaten had worked at MCA for approximately nine years, beginning in March 1973. During his tenure at MCA, Slaten managed the disc replication department, among other things. (Tr. 1074–75). Certainly, Slaten was familiar with the MCA disc, and he stated that the discs produced at MCA in 1973 and 1974 had the same configuration as discs produced in 1972. The jury could reasonably have accepted Slaten's expert opinion, the only one given on this issue, that the MCA disc met claim element 8 of the '743 Patent.

The jury would have evaluated Slaten's opinion in the light of the other evidence produced. The other evidence is consistent with Slaten's opinion. As has already been explained, there was substantial evidence in the record to support the jury's finding that the MCA disc had the same structure as the patented invention. It would be odd if a disc with the same structure somehow diffracted light in a different way. To be within this claim element, the disc was required to diffract light in a manner that represented track misregistration. The invention contemplates that the way in which light is diffracted is dependent upon the structure of the disc. Because the MCA disc had essentially the same structure as the patented invention, the jury could reasonably have inferred that the MCA disc diffracts light in the same way as the patented invention; i.e.,

in a way that represents track misregistration.

Such an inference would be supported by Wilkinson's testimony which explained that the MCA disc could have been tracked down the center, which can be equated to tracking by measuring the spatial distribution of light, if another player had been used:

Q. Was whether one tracks down the center of the track or the side of the track related to the player or the disk?

A. The player.

Q. Could the same disk be tracked down the center or the side of the track?

A. Yes. If the player were equipped to do so, certainly.

  *   *   *   *   *   *

Q. Would modifications of the disk be necessary to do that?

A. No.

(Tr. 807–08). Later, Wilkinson explained that the problem with tracking down the center was that the MCA player used only a single photodetector. (Tr. 847). Canino also testified that the MCA player simply was not capable of receiving "information about the asymmetry of diffraction which the disk causes." (Tr. 965). The gist of all of the testimony is that the disc gave off an asymmetric spatial distribution of light that could have been used to keep the light spot on track if MCA had developed a two photodetector player that could have measured the spatial distribution of light emanating from the disc. Because it is the structure of the disc (not the design of the player) that is addressed by the patents in issue, the jury reasonably could have determined that the MCA disc satisfied this final claim element. Especially since there was a dearth of competent evidence to lead the jury away from this conclusion, the jury could reasonably have found the evidence to be clear and convincing that claim element 8 of the '743 Patent was met.

In sum, the MCA disc contained all of the claim elements of the '743 Patent.

## V.

Thomson further argues that Defendants improperly misled the jury into deciding the prior invention issue based on who was ahead in the laboratory rather than whether there was clear and convincing evidence to show that MCA's disc met every element of the representative claims.

Much of the Defendants' argument did deal with marginally relevant or irrelevant material, but much of it was provoked by irrelevant matter introduced by Thomson. Thomson opened the door, and Defendants walked through it. Surprisingly, Thomson has not identified one objection made and overruled in regards to the relevance of any of the questions or statements of Defendants' counsel that are now at issue. Thomson did not request a special instruction addressing its concerns, and Thomson does not contend that the jury instructions led the jury astray.

In fact, the jury instructions given by the Court diminished the arguably prejudicial effect of defense counsel's questions and comments which may have been objectionable. This Court instructed the jury both before and after trial that counsel's arguments and questions are not evidence. (Tr. 32; 1356). Another instruction informed the jury that "[i]t is not necessary that plaintiff make CD's in order for you to find infringement of the claims by defendant's products." (Tr. 1373). Finally, the jury was given a proper instruction on anticipation:

### 4.2 ANTICIPATION— ALL ELEMENTS

In order to prove anticipation of the invention claimed in one of the representative claims under 35 U.S.C. § 102(g), it is necessary that all the elements of the invention, as expressed in that representative claim, be found in a single prior invention and that prior invention must not have been abandoned, suppressed or concealed.

At no time was the jury instructed that the issue of who was ahead in product development was in any way relevant.

In reviewing the jury's decision on patent validity, this Court must presume that the jury made the proper findings to support its verdict. *Shearing v. Iolab Corp.*, 975

F.2d 1541, 1544 (Fed.Cir.1992). The jury was properly instructed on the law. It must be presumed that they followed the Court's instructions and disregarded the arguments and questions of counsel that did not help them resolve the questions they were charged to decide. Because there is substantial evidence in the record from which the jury reasonably could have decided, as they did, that Defendants proved that the MCA disc was a prior invention meeting all of the elements of the representative claims, Thomson's motion for judgment as a matter of law will be denied.

## VI.

Thomson moves in the alternative for a new trial on the prior invention issue. In support of its motion, Thomson makes three arguments: (1) Defendants failed to present clear and convincing evidence that the MCA disc met all elements of the representative claims; (2) the Court erred in refusing to charge that corroboration was required for the oral testimony of Canino and Wilkinson; and (3) the Court erred in refusing to allow Plaintiff to present testimony on its licensing program.

Thomson's first argument has already been resolved. This Court has ruled that there was substantial evidence in the record to support the jury's decision that Defendants proved by clear and convincing evidence that the MCA disc met all elements of the representative claims.

■ Next, Thomson argues that this Court should have instructed the jury that corroboration was required for the testimony of Wilkinson and Canino. This Court refused to charge the jury that corroboration was required because corroboration is necessary only for the testimony of an inventor. It is undisputed that Wilkinson and Canino were not the inventors of the MCA disc. The Federal Circuit has consistently held that only an inventor's testimony needs to be corroborated. *Price v. Symsek*, 988 F.2d 1187, 1195 (Fed.Cir.1993) ("Only the inven-

tor's testimony requires corroboration before it can be considered"); *Holmwood v. Sugavanam*, 948 F.2d 1236, 1239 (Fed.Cir.1991) ("Only an inventor's testimony needs corroboration"); *Borror v. Herz*, 666 F.2d 569, 573 (CCPA 1981) ("[I]t is only the inventor's testimony that cannot stand alone").[7]

Thomson seems to suggest that these repeated statements by the Federal Circuit are dicta because they were announced in cases in which the inventor's testimony was challenged as being insufficiently corroborated. (D.I. 308 at 37). Thomson misconstrues some of the relevant precedent. Two cases refute Thomson's argument. *See Holmwood v. Sugavanam*, 948 F.2d 1236 (Fed.Cir.1991); *Tolle v. Starkey*, 45 C.C.P.A. 979, 255 F.2d 935 (1958).

The case of *Holmwood v. Sugavanam*, 948 F.2d 1236 (Fed.Cir.1991), involved an appeal from a decision of the Board of Patent Appeals and Interferences ("Board") relating to an invention of a chemical fungicide. The Board had held that Holmwood failed to establish a reduction to practice prior to the effective filing date of the senior party, Sugavanam. Holmwood and Sugavanam were therefore the inventors of the fungicides. The deposition testimony of Dr. Walter Zeck, a non-inventor, was introduced to establish Holmwood's reduction to practice. Dr. Zeck explained that he received Holmwood's fungicide on September 16, 1980, and evaluated that compound's fungicidal effectiveness. At trial, Dr. Zeck testified about the effectiveness of Holmwood's invention. The Federal Circuit held that the Board's discussion of corroboration in the context of evaluating Dr. Zeck's testimony was misplaced:

The Board also characterized Dr. Zeck's testimony as lacking "sufficient corroboration." The Board's use of the term "corroboration" is misplaced. Only an inventor's testimony needs corroboration. *Borror v. Herz*, 666 F.2d 569, 573, 213 USPQ 19, 22 (CCPA 1981). Dr. Zeck's testimony did not require "corrob-

7. The complete relevant quote in *Borror* follows: It is only in relationship with an inventor's testimony that the sobriquet "corroborator" is appropriate. The testimony of witnesses, other than the inventor, is not ipso facto of a subordinate nature. On the contrary, it is only the inventor's testimony that cannot stand alone. *Borror*, 666 F.2d at 573.

oration" as that term is used in interference practice. Rather, the Board must view the evidence as a whole to determine if the inventor's story withstands careful examination. Holmwood offered Dr. Zeck's testimony and the test results as corroboration for his reduction to practice in the United States before October 16, 1981.

*Holmwood,* 948 F.2d at 1239–40. Consequently, the Federal Circuit reversed the Board. *Id.* at 1240.

A similar situation occurred in *Tolle v. Starkey,* 45 C.C.P.A. 979, 255 F.2d 935 (1958). That case was also an appeal from a decision of the Board which awarded priority of invention to William A. Starkey over Vance W. Tolle and Paul E. Ludy. On August 1, 1944, Tolle, Ludy, Starkey and Edwin M. Ransburg had participated in some experiments regarding the electrostatic coating of steering wheels. The novel feature of the invention was to apply the coating to the wheels while they were at an elevated temperature. Ransburg, a non-inventor, testified that Tolle and Ludy suggested drying the wheels by placing them in an oven for about one minute, but this resulted in no improvement. Ransburg further testified that it was Starkey who decided to heat the wheel for thirty minutes, which did improve the coating. Tolle and Ludy argued that Ransburg's testimony about Starkey's thirty-minute heating was "not corroborated and therefore cannot be accepted as sufficient." *Tolle,* 255 F.2d at 938. The court rejected this argument:

> [T]he rule which requires corroboration of an inventor's testimony does not apply to a single witness testifying after the death of the inventor, as to disclosures made to him by the inventor.

*Id.* at 938. In *Tolle,* as in *Holmwood,* the court held that a noninventor's testimony need not be corroborated.

The law is clear. This Court's ruling that the testimony of Wilkinson, Canino and Slaten needs no corroboration will stand. No new trial is warranted on that ground.

■ Thomson's third and final basis for requesting a new trial is that this Court refused to allow Thomson to present testimony on its licensing program. Thomson ar-

gues that Defendants repeatedly made improper references throughout the trial to the failure of Plaintiff's technology, the differences between compact discs and Plaintiff's video discs, and the role of other companies in developing and administering the standards for CDs. Thomson argues that a particular remedy should have been awarded for this wrong:

> Plaintiff submits that the only possible way to overcome the prejudicial impact of these improper references was to permit [ ] plaintiff to present evidence in rebuttal on its licensing program, thereby showing that, whatever the merits of plaintiff's commercial product, whatever its differences from CDs, and whatever the role of others in developing CDs, plaintiff has indeed been recognized by the rest of the industry as making an important contribution to the technology of CDs, and the rest of the industry recognizes that contribution by paying tribute to the patents-in-suit.

(D.I. 308 at 38–39).

Thomson's argument must be rejected for a number of reasons. First, allowing evidence of the licensing program was clearly not the "only possible way" to overcome any prejudicial effect of Defendant's statements. Under Fed.R.Evid. 403, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . . ." The remedy of Rule 403 is the exclusion of improper evidence, not the inclusion of countervailing irrelevant and prejudicial evidence. Thomson has identified not a single instance in the record where Thomson made a Rule 403 objection to the allegedly prejudicial evidence of which it now complains.

Nor has Thomson contended that it requested a special instruction from the Court which might have alleviated any unfair prejudice which might have existed. After Defendants' opening statement, where most of the allegedly prejudicial statements were made, Thomson requested a sidebar. In that sidebar, Thomson did not address any allegedly improper references to the failure of Plaintiff's technology, the differences between compact discs and Plaintiff's video discs, and the role of other companies in developing and

administering the standards for CDs. Rather, Thomson argued that Defendants improperly said that the patent was invented long ago and that compact discs were digital, not analog. Even then, Thomson argued that "the only way we can get back on track is if I'm briefly allowed to have a rebuttal opening about the Thomson license and bring the Thomson license in." (Tr. 95–6). The Court declined to allow the rebuttal opening but suggested the possibility of dealing with any problem through the testimony of witnesses and the jury instructions. (Tr. 97).

Thomson's continuing efforts to introduce evidence of its patent licensing program resulted from Defendants' tactical decision to drop its obviousness defense. Thomson's licensing program would have been relevant to the issue of commercial success in an obviousness defense but was totally irrelevant to the defense of anticipation by prior invention. Despite its lack of relevance, Thomson pushed hard for its inclusion in the case. Such evidence was irrelevant to the case and was properly excluded. Therefore, Thomson's motion for a new trial will be denied.